Case 4:24-cv-02616   Document 40   Filed 01/12/26 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
January 13, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| J&R MULTIFAMILY GROUP, LTD. DBA THE WORTHINGTON AT THE BELTWAY, <br><br> Plaintiff, <br><br> v. <br><br> LANDMARK AMERICAN INSURANCE COMPANY, <br><br> Defendant. | § § § § § § § § § § § § § <br> CIVIL ACTION NO. H-24-2616 |

**MEMORANDUM AND OPINION**

Wear and tear or wind and hail? This common question in Texas insurance cases is at the heart of the dispute between the plaintiff, J&R Multifamily Group, Ltd. dba The Worthington at the Beltway, and its insurance provider, the defendant Landmark American Insurance Company. J&R alleges that Landmark failed to pay the insurance benefits due after severe weather allegedly caused extensive damage to the property. (Docket Entry No. 1-5). In turn, Landmark contends that the roof replacements and several other repairs J&R demanded are not covered under the policy and that Landmark has already paid J&R for the covered losses. Landmark moved for summary judgment. (Docket Entry No. 16). Based on the motion, the response and reply, the record, and the applicable law, the court grants in part and denies in part Landmark's motion for summary judgment. The reasons are explained below.

**I.      Background**

J&R manages property at 1350 Greens Parkway in Houston that was covered by a Landmark-issued insurance policy. (Docket Entry No. 1-5 ¶¶ 10, 11). The property "is a multi-

family residential complex" called the Worthington at the Beltway. (*Id.* ¶ 11). The Worthington consists of 12 residential buildings and one office building.[1] (Docket Entry No. 30 at 2).

J&R had a Landmark insurance policy with an effective date of May 17, 2023. (Docket Entry 30-1 at 2). The policy covered buildings, personal property, and business income at the Worthington, subject to several endorsements. (Docket Entry No. 30-1 at 2). Relevant endorsements included limitations on roof surfacing coverage and an exclusion for preexisting damage. (*Id.* at 23, 35). The roof endorsement provided replacement cost value coverage for roofs younger than 12 years old on the date of loss and actual cash value for older roofs. (*Id.* at 23). Cosmetic roof damages were not covered. (*Id.*).

On June 8, 2023, a storm rolled through the Greater Houston area. (Docket Entry No. 1-5 ¶ 12). On July 13, 2023, J&R notified Landmark that wind and hail had caused "damages to the roof and exterior elevations" at the Worthington.[2] (Docket Entry No. 16-5 at 2). Landmark informed J&R the next day that a claim number, file handler, and independent adjuster had been assigned. (Docket Entry No. 16-6 at 2). Landmark assigned Lance Grigar, an adjuster at Engle Martin, and Matthew Oestrike, an engineer with Nelson Forensics, LLC, to investigate J&R's claim. (Docket Entry No. 16-7 at 2; Docket Entry No. 16-14 at 2). On July 18, 2023, Grigar contacted J&R to schedule inspection dates. (Docket Entry No. 16-15 at 4–5). Both parties agreed to August 7–10, 2023, as the dates for inspection. (*Id.* at 2).

On September 13, 2023, Nelson Forensics produced an engineering report to Engle Martin. (Docket Entry No. 16-8). The report concluded that the roof damage was "attributed to wind in

---

[1] There is some inconsistency in the briefing and the record as to whether the Worthington consists of 12 residential buildings and an office, 12 apartment buildings, or 13 apartment buildings and assorted other structures, but that difference is ultimately immaterial to the court's ruling here.
[2] J&R's communications with Landmark were primarily conducted through its counsel, the Zar Law Firm. (*See, e.g.*, Docket Entry No. 16-5 at 2).

2

conjunction with" preexisting conditions before "the reported date of loss." (Docket Entry No. 16-8 at 41). The report also stated that, based on historical imaging, the roofs at Buildings 2 through 12 were over 12 years old.[3] (*Id.*). The report recommended a number of repairs to the damaged roofs, mainly single shingle replacement. (*Id.* at 42–43).

The next day, Grigar asked to reinspect the Worthington to assist in "calculat[ing] the per building deductibles." (Docket Entry No. 16-17 at 2). Grigar wanted to compare the locations with the unit listing and square footages that J&R provided to Engle Martin after the initial onsite inspection. (*Id.*). Landmark alleged that a discrepancy between the number of buildings at the Worthington delayed the calculation of per-building deductibles.[4] (Docket Entry No. 31 at 8–9) (*see also* Docket Entry No. 16-19 at 2). The parties eventually agreed on a method of calculation on December 6, 2023. (*See* Docket Entry No. 16-20 at 4).

On December 15, 2023, Grigar informed J&R via email that its claim—less depreciation and deductible—was valued at $18,094.01. (Docket Entry No. 16-21 at 5). This total was calculated by subtracting the deductible and the applicable depreciation from Landmark's determination of $181,068.48 as the figure for the loss to the buildings. (*Id.*). On January 23, 2024, J&R emailed Grigar, stating that it "d[id] not agree with [Engle Martin's] estimate or the engineering report." (Docket Entry No. 16-23 at 2). On January 24, 2024, Landmark issued a check to J&R for $18,094.01. (Docket Entry No. 16-9 at 2).

---

[3] The report also stated that a portion of the roof on B1S was over 12 years old. (Docket Entry No. 16-8 at 41).

[4] The dispute was based on whether the Worthington had 32 apartment buildings, a clubhouse, and laundry buildings, as stated on the Harris County Appraisal District's assessment of the property, or 13 individual apartment buildings, a clubhouse, and laundry buildings, as the property "actually" contained. (Docket Entry No. 16-20 at 3). The parties agreed to calculate a per building deductible by taking the square footages of the buildings provided by the insured and applying the $100 per foot insured value to calculate an insured value for the 13 apartment buildings; Engle Martin could then use that insured value to calculate the 2% per building deductible. (*Id.* at 4).

3

On March 25, 2024, Mark Earle, a line adjuster with Built Right Construction & Consulting Group, LLC, prepared a damage estimate for J&R. (Docket Entry No. 30 at 3; Docket Entry No. 30-2). Earle calculated a replacement cash value of $3,670,342.43. (*Id.*). Based on the disparity between Earle's and Engle Martin's cash valuations, J&R provided Landmark with a presuit notice. (*Id.*). J&R later retained Earle as a testifying expert. (Docket Entry No. 30 at 3). Earle's supplemental report estimated an actual cash value loss of $3,399,465.50, after depreciation but before applying the deductible. (Docket Entry No. 30-8 at 143). J&R also hired Matt Phelps, an engineer with APEC Engineering & Laboratory, LLC, as a testifying expert. (Docket Entry No. 30 at 3). Based on field testing, photographic evidence, data analysis, and more, Phelps concluded that the windstorm "caused the damage observed" and "replacement of the whole roof is required" because of "the extent of the damage to the roof and failure of previous repairs." (Docket Entry No. 30-9 at 110). Meanwhile, Landmark retained its own litigation engineering expert, BSC Forensic Services, LLC, which used historical aerial images and a physical inspection to conclude that the roofs were more than 12 years old and that the damage was unrelated to any wind or hail event. (Docket Entry Nos. 16-25 at 15–16, 44; Docket Entry No. 16-26).

On June 13, 2024, J&R sued Landmark in state court. (Docket Entry No. 1-5). J&R asserted causes of action for breach of contract, violations of the Texas Insurance Code, and violations of the Deceptive Trade Practices Act. (*Id.*). Landmark later removed on the basis of diversity jurisdiction. (Docket Entry No. 1). On May 23, 2025, Landmark moved for summary judgment and to strike the testimony of Earle and Phelps. (Docket Entry Nos. 15, 16, 17). The court denied the motions to strike. (Docket Entry No. 26). J&R responded to the summary judgment motion, (Docket Entry No. 30), and Landmark filed a reply. (Docket Entry No. 31).

4

**II.     Legal Standard**

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).  When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c).  "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a

5

genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which the evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51).

**III.    Analysis**

    **A.    The Breach of Contract Claim**

Sitting in diversity, the court "must apply Texas law as interpreted by Texas state courts." *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000). An insured claiming breach of an insurance contract must prove: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Certain Underwriters at Lloyd's of London v. Lowen Valley View, L.L.C.*, 892 F.3d 167, 170 (5th Cir. 2018) (quoting *Smith Int'l., Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007)).

Under Texas law, "[t]he insured bears the burden of establishing that its claim is covered by the policy." *Id.* "[B]ut the insurer has the burden to prove the applicability of an exclusion that would allow it to deny coverage." *Dillon Gage, Inc. of Dallas v. Certain Underwriters at Lloyds*, 992 F.3d 401, 403 (5th Cir. 2021). Even so, "[a]n insured cannot recover under an insurance policy unless it pleads and proves facts that show that its damages are covered by the policy." *Tchakarov v. Allstate Indem. Co.*, No. 3:20-cv-2769, 2021 WL 4942193, at *5 (N.D. Tex. Oct. 22, 2021).

1. **Claimed Loss Valuation**

Landmark argues that J&R cannot recover, either in whole or in part, for the roof damage because J&R applied the wrong valuations. Landmark first argues that J&R's recovery is limited to actual cash value, rather than replacement cash value, for the roofs for Buildings 2 through 12 because the uncontradicted summary judgment evidence shows that those roofs were more than 12 years old when the storm occurred, and the policy allows only actual cash value for roofs more than 12 years old.[5] (Docket Entry No. 16 at 17). Landmark then argues that J&R "cannot satisfy its burden to prove its claimed damages are covered under the policy" in any event because its calculations were based on a January 2025 price list, rather than a June 2023 price list. (*Id.* at 18).[6] In response, J&R argues that the issue of replacement cash value versus actual cash value is "immaterial" because J&R's actual damages remain capped by the policy's $2.5 million hail/wind

---

[5] Landmark is not seeking summary judgment on this issue for buildings B1N and B1S, which Nelson Forensics had concluded (in conflict with some of the other summary judgment record evidence) were less than 12 years old. (Docket Entry No. 16 at 17 n.32).

[6] Landmark also argues that J&R failed to provide an actual cash value estimate and only provided a replacement cash value estimate. (Docket Entry No. 16 at 18). As J&R notes, this argument was mooted by Earle's supplemental report, which provided an actual cash value estimate. (Docket Entry No. 30 at 5; Docket Entry No 23-7).

7

sublimit regardless of coverage type and that the use of the January 2025 price list was neither improper nor material.[7]  (Docket Entry No. 30 at 5–6).

The court concludes that J&R may recover only actual cash value for the roofs of Buildings 2 through 12.  J&R has pointed to no evidence that the roofs on Buildings 2 through 12 were less than 12 years old.  By contrast, Landmark has pointed to evidence demonstrating that these roofs were more than 12 years old.  (Docket Entry No. 16 at 17) (citing Docket Entry No. 16-4; Docket Entry No. 16-11 at 32; Docket Entry No. 16-27 at 64; Docket Entry No. 16-25 at 15–16; Docket Entry No. 16-8 at 40).  Because the record does not show a genuine factual dispute material to determining that the roofs on Buildings 2 through 12 were less than 12 years old on the date of loss or that an exception applies, J&R's recovery is limited to actual cash value.  *April Point S. Prop. Owner's Ass'n, Inc. v Third Coast Ins. Co.*, Civ. Action No. H-23-2654, 2024 WL 3418009, at *3 (S.D. Tex. July 15, 2024).

The court also concludes that the dispute about the date of loss pricing is not fatal to J&R's breach of contract claim at this stage.  While the policy is clear that J&R can only collect damages valued "as of the time of loss," (Docket Entry No. 30-1 at 23), as the court noted in denying Landmark's motion to strike Earle's report, there is no record evidence to support an inference that the January 2025 price list is materially different than the June 2023 price list.[8]  (Docket Entry No. 26 at 3–4).  Landmark is entitled to summary judgment limiting the damages to the costs of repair as of the date and place of loss, but it is not entitled to summary judgment on the entire breach of contract claim based on the use of the January 2025 price list.  *See April Point*, 2024 WL 3418009,

---

[7] Specifically, J&R asserts that even using actual cash value instead of replacement cash value, its loss after applying the deductible is still over the $2.5 million cap.  (Docket Entry No. 30 at 5–6).

[8] Landmark's reply brief does not even compare June 2023 and January 2025 price lists.  Rather, it compares prices from September 2023 (the post-storm price list that Landmark's own engineer used) and January 2025 to show examples of changes in price.  (Docket Entry No. 31 at 3 n.2).

8

at *3–4 (concluding, at the summary judgment stage, that a similar provision was "unambiguous" and limiting the defendant's "obligation to pay repair costs to the prices at the date of loss"); *Majestic Oil, Inc. v. Underwriters at Lloyd's, London*, No. 4:19-cv-03149, 2025 WL 933946, at *6 n.3 (S.D. Tex. Mar. 27, 2025) (asserting that the defendant's "quibbles" with the expert's damages estimates were "matters for cross-examination, not summary judgment").

### 2. The Claim for Interior Damages

Landmark asserts that J&R is not entitled to coverage for interior damage. (Docket Entry No. 16 at 18). Landmark points to repeated statements that J&R made assuring Landmark that it was not seeking coverage for interior damages. (*Id.*) (citing Docket Entry Nos. 16-16, 16-33). Landmark states that despite these assurances, Earle's estimate includes repair costs for interior damage. (*Id.*) (citing Docket Entry No. 16-30). In response, J&R notes that Earle's report includes only one interior item in need of repair, a single laundry room. (Docket Entry No. 30 at 6).

The court agrees with Landmark. During the claim investigation, J&R assured Landmark that it "wishe[d] to focus solely on the exterior damage and d[id] not want to claim the interior, which is relatively minor." (Docket Entry No. 16-16 at 2). J&R's response that Earle's estimate included only minor claims for interior damages is irrelevant and fails to raise a genuine issue of material fact as to whether Landmark could have committed a breach of contract for failing to cover claims that J&R expressly stated it did not wish to pursue.

### 3. The Claim for Hail Damage

Landmark next argues that J&R cannot recover for "[n]on-[e]xistent" hail damage. (Docket Entry No. 16 at 19). Landmark points out that Earle's report included repair costs for "hail damage," even though Earle had "deferr[ed] all weather causation to" Phelps. Phelps's report had concluded that "high winds during the storm have caused the damage to the roofs at the

9

subject property" and made no comment about hail. (Docket Entry No. 30-9 at 110). In his deposition, Phelps also testified that he "did not see any hail damage" at the Worthington, but there was impact damage he believed "was a result of debris impact." (Docket Entry No. 30-3 at 83). In response, J&R asserts that the only damages in Earle's report arguably attributable to hail alone are exterior paint finishes, and those damages are "wholly consistent" with damage caused by wind-borne debris. (Docket Entry No. 30 at 7). Landmark replies that since "all experts agree that no hail fell" on the Worthington on the alleged date of loss, damage attributable to hail must have "pre-dated the policy period." (Docket Entry No. 31 at 5).

Based on the summary judgment record, J&R may seek damages consistent with hail impacts that the evidence shows are actually the result of wind-related debris impacts from the storm. Because J&R has not pointed to specific facts in the record establishing a genuine dispute as to whether hail fell on the date of loss, J&R may not recover for damage solely from hail.

### 4.     The Anti-Concurrent-Causation Clause

Under Texas law, an anti-concurrent-causation clause and an exclusion, "read together, exclude from coverage any damage caused by a combination" of covered and non-covered perils. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 608 (Tex. 2015) (quoting *ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*, 400 F. App'x 938, 941 (5th Cir. 2010)). "To determine coverage under the policy, [courts] look first to 'the language of the policy because [courts] presume parties intend what the words of their contract say.'" *Id.* (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)).

J&R's policy contains an exclusion for "loss or damage which occurs during [the] Policy period, but was caused directly or indirectly by pre-existing damage which pre-dated" the policy. (Docket Entry No. 30-1 at 35). That loss "is excluded regardless of any other cause or event that

10

contributes concurrently or in any sequence to the loss." (*Id.*). Based on this language, in Landmark's view, J&R cannot recover for a full roof replacement because the loss "is due to the preexisting damage of the aged roofs." (*Id.*). Landmark cites testimony from Phelps that the age of the roofs made them a poor candidate for repair and from Earle that there was preexisting deterioration to the roof decking. (*Id.* at 20–21). J&R asserts that Landmark mischaracterizes the cause of the roofing loss by attributing it to wear and tear as opposed to the storm alone. (Docket Entry No. 30 at 8–9).

Expert reports and testimony in the record show that whether preexisting damage caused any of the claimed loss is genuinely disputed. Earle's report attributes "the direct cause of the damage sustained" to the storm. (Docket Entry No. 30-8 at 8, 9, 23). Phelps's report also concludes that the wind storm "caused the damage to the roofs." (Docket Entry No. 30-9 at 109). Jay Shani, J&R's corporate representative, testified that the roof was in good condition before the wind storm. (Docket Entry No. 16-10 at 171).[9] By contrast, the Nelson Forensics report opines that J&R's claimed loss is "attributed to wind in conjunction with" wear and tear before the date of loss. (Docket Entry No. 16-8 at 41). And the BSC Forensics report asserts that the buildings "exhibited conditions associated with deferred maintenance, improper maintenance, and/or deficiencies that were unrelated to hail impacts and/or the effects of wind." (Docket Entry No. 16-25 at 43). Viewed in the light most favorable to J&R, the dueling expert evidence creates a genuine factual dispute material to determining whether the storm caused all or only part of the roof damage

---

[9] Landmark asserts that Shani "conceded during deposition that he was merely speculating" that the windstorm caused the leaks that occurred following the storm. (Docket Entry No. 31 at 6) (*see also* Docket Entry No. 16-10 at 178–179). But Shani later qualified that statement, testifying that leaks reported before the windstorm were repaired. (Docket Entry No. 16-10 at 195–196). He stated that the windstorm caused new leaks that were previously not there. (*Id.*).

11

to the Worthington.[10] *See e.g.*, *Advanced Indicator & Mfg., Inc. v. Acadia Ins. Co.*, 50 F.4th 469, 476–78 (5th Cir. 2022) (per curiam) (reversing summary judgment); *Kabir Marina Grand Hotel, Ltd. v. Landmark Am. Ins. Co.*, No. 2:18-cv-00237, 2022 WL 19517466, at *2–3 (S.D. Tex. Jan. 18, 2022) (denying summary judgment); *Majestic Oil*, 2025 WL 933946, at *5–*6 (same).

Landmark also argues that, under *All Saints Cath. Church v. United Nat. Ins. Co.*, 257 S.W.3d 800, 802 (Tex. App.—Dallas 2008, no pet.), J&R is not entitled to a full roof replacement because the policy covers only the shingles specifically damaged by the storm. (Docket Entry No. 16 at 22–25). But the question in *All Saints* was whether the doctrine of concurrent causation entitled the insured to the full cost of a roof replacement when both a covered and non-covered peril (defective tiles) caused the loss. 257 S.W.3d at 804. The answer was that the insured was entitled to recover only the portion of damage caused solely by the covered peril. *Id.* Notably, there was no dispute in *All Saints* about whether the non-covered peril caused any of the claimed loss. *See id.* ("Part of the loss of the roof resulted from a covered peril[,] the hailstorm, while part of the loss resulted from non-covered perils[,] wear and tear and latent defects."); *see also Douglas v. Landmark Am. Ins. Co.*, No. 22-cv-00167, 2024 WL 4101934, at *2–4 (W.D. Tex. July 7, 2024) ("Landmark applies an oversimplified understanding of the [concurrent-causation] doctrine by citing *All Saints Catholic Church*."). A review of the record in the light most favorable to J&R

---

[10] This conclusion applies to both the roof and the roof decking. Landmark separates them out and argues that J&R is not entitled to replacement costs for the roof decking because Phelps "admitted the roof decking was not damaged by the alleged storm event" and because Earle "testified that the roof decking had pre-existing deterioration." (Docket Entry No. 16 at 19) (citing Docket Entry No. 16-27 at 120; Docket Entry No. 16-30 at 77). However, Earle explicitly stated that that he was attributing all the damage to the decking to the date of loss. (Docket Entry No. 16-30 at 78). Taking all the evidence in the light most favorable to J&R, there is a genuine issue of material fact as to whether the storm caused all the damage to the roof decking too.

supports that reasonable minds could differ on whether the storm caused all of J&R's claimed roof damage and loss.

### 5. The Allocation of Damages

Finally, Landmark argues that J&R failed to allocate its damages between covered and non-covered perils. (Docket Entry No. 16 at 25–26). This argument is intertwined with the causation question. J&R contends that the wind storm was the sole cause of its claimed loss. (Docket Entry No. 30 at 8–10). Implicit in this theory is a complete allocation of damages to the covered event: the wind storm. *See Kabir Marina*, 2022 WL 19517466, at *2–3. There is sufficient evidence to establish a genuinely disputed causation question for a jury. If the jury agrees with J&R's sole causation theory, then J&R has properly allocated its damages.

### B. The Extra-Contractual Claims

#### 1. The Bad Faith/Deceptive Trade Practices Act Claims

Texas law imposes on insurers "a common law duty to deal fairly and in good faith with its insured in the processing and payment of claims." *Aleman v. Zenith Ins. Co.*, 343 S.W.3d 817, 822 (Tex. App.—El Paso 2011, no pet.) (citing *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995)). "An insurer will be liable if [it] denies a claim when the insurer knew or should have known that it was reasonably clear that the claim was covered." *Id.* "An insurer may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim." *Id.* The breach of the duty "'focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct' in handling the claim." *Id.* (quoting *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993)).

If "the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of

13

bad faith." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997). "In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim." *Id.* Bad faith excludes "[a] simple disagreement among experts about whether the cause of the loss is one covered by the policy." *Tex. Friends Chabad-Lubavitch, Inc. v. Nova Cas. Co.*, 539 F. Supp. 3d 669, 682 (S.D. Tex. 2021) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994)). "Absent legally sufficient evidence of bad faith, [a plaintiff's] claims under the common law, insurance code chapter 541, and the [Deceptive Trade Practices Act] are subject to summary judgment." *Spicewood Summit Off. Condominiums Ass'n, Inc. v. Am. First Lloyd's Ins. Co.*, 287 S.W.3d 461, 468 (Tex. App.—Austin 2009, pet. denied).

The record shows that Landmark responded within a day of J&R's claim notification and retained an adjuster. (Docket Entry Nos. 16-5, 16-6, 16-7). The initial investigation began a few days later, with Engle Martin reaching out to J&R to schedule agreed-on inspection dates. (Docket Entry No. 16-15 at 4–5). The inspection occurred from August 7–10, 2023. (*Id.* at 2). Documentation discrepancies delayed the calculation of the total value of the Worthington and applicable policy deductibles. (Docket Entry Nos. 16-17, 16-19). On December 6, 2023, the parties agreed on the calculation method. (Docket Entry No. 16-20 at 3–4). Nine days later, Landmark provided its estimate of covered loss to J&R. (Docket Entry No. 16-21). On January 23, 2024, J&R notified Landmark of its disagreement. (Docket Entry No. 16-23). The next day, Landmark cut a check for the amount it estimated J&R was entitled to receive under the policy. (Docket Entry No. 16-9). The parties then disputed, via dueling experts, the cause of the loss and

what the policy covers. This bona fide controversy precludes liability for bad faith. The court grants summary judgment to Landmark on J&R's claims based on bad faith.

### 2. Prompt Payment of Claims Act

J&R also brought claims for violation of multiple subsections of Chapter 542 of the Texas Insurance Code, otherwise known as the Prompt Payment of Claims Act. (Docket Entry No. 1-5 ¶¶ 31–34). To recover under this statute, "an insured must demonstrate the insurer's (1) liability under the policy, and (2) failure to comply with" the statute. *Advanced Indicator and Mfg., Inc. v. Acadia Ins. Co.*, 50 F.4th 469, 477 (5th Cir. 2022).

The court grants summary judgment to Landmark on some of J&R's Chapter 542 claims and denies it on others. Specifically, the court grants summary judgment to Landmark on J&R's claim under § 542.055(a) because the evidence shows that Landmark acknowledged the claim, opened an investigation, and requested information from J&R within a week of J&R submitting its claim.[11] (Docket Entry Nos. 16-5, 16-6, 16-7, 16-14, 16-15). Although J&R asserts that Landmark violated the statute because the inspection did not occur until August 7, 2023, (Docket Entry No. 30 at 13), Landmark began its investigation promptly by assigning Engle Martin and Nelson Forensics to investigate, and Engle Martin reached out to J&R to schedule an inspection within five days of J&R submitting the claim. (Docket Entry No. 16-15 at 4–5). The question is whether the investigation *began* within the statutory time frame, not whether the inspection occurred within that time frame. *See, e.g., Lee v. Catlin Specialty Ins. Co.*, 766 F. Supp. 2d 812, 815, 826 (S.D. Tex. 2011) (the investigation began within statutory period when the insurer

---

[11] Section 542.055(a) provides that an eligible surplus lines insurer shall have thirty business days from the date it receives notice of a claim to "(1) acknowledge receipt of the claim; (2) commence any investigation of the claim; and (3) request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." TEX. INS. CODE § 542.055(a). All other insurers have fifteen days to comply. *Id.*

15

assigned Engle Martin to investigate the claim and Engle Martin immediately attempted to contact the owner, even though the inspection did not occur for another two months).

The court also grants summary judgment to Landmark on J&R's claims under § 542.056(a), which requires that an insured notify a claimant of acceptance or rejection of a claim within 15 business days of receiving all items, statements, and forms required to secure final proof of loss. TEX. INS. CODE § 542.056(a). The Fifth Circuit has clarified that the "information and documentation 'required by the insurer to secure a final proof of loss' under § 542.056 will depend on the facts and circumstances involved in a given case." *Weister-Brown Oper. Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 522 (5th Cir. 2015). In this case, the record shows that until early December 2023, J&R and Landmark were engaged in an ongoing conversation as to how to properly calculate the deductible. (Docket Entry Nos. 16-17, 16-19). J&R and Engle Martin did not agree upon the method for calculating the per-building deductible until December 6, 2023. (Docket Entry No. 16-20 at 3–4). On December 15, 2023, less than two weeks later, Engle Martin informed J&R that Landmark would issue a payment for the sworn statement in proof of loss provided.[12] (Docket Entry No. 16-21).

Next, the court grants summary judgment to Landmark on J&R's claim under § 542.057. This subsection requires that, in the case of a surplus lines insurer, an insurer must pay a claim no

---

[12] J&R does not argue that there was any impropriety with the notice or information provided. (Docket Entry No. 30 at 13). Rather, it argues that Landmark's "justification for this delay—alleged confusion about the policy's deductible calculation—does not excuse the statutory violation." (*Id.*). But the record shows a genuine dispute as to how to calculate the loss and that J&R did not agree to the loss calculation method until December 2023. (Docket Entry Nos. 16-19, 16-20). Landmark could not secure final proof of loss without a proper calculation of the deductible. (Docket Entry No. 16-21 at 5). Under J&R's interpretation of the statute, "an insured could make a claim and then ignore or delay the insurer's request for information necessary to secure proof of loss until well past the alleged [Prompt Payment of Claims Act] deadlines, thereby bringing suit to reap the benefits of its . . . delay." *See Lakeside FBBC, LP v. Everest Indem. Ins. Co.*, 612 F. Supp. 3d 667, 684 (W.D. Tex. 2020).

later than twenty business days after providing notice, unless payment of the claim is conditioned on performance of an act by the claimant. TEX. INS. CODE § 542.057(a)–(c). Landmark points out that its policy requires that an insured return a signed sworn proof of loss form and that J&R failed to do so. (Docket Entry No. 31 at 12) (citing Docket Entry No. 16-22 at 2). Because J&R failed to sign a sworn proof of loss, § 542.057 was not triggered. *See Lakeside FBBC, LP v. Everest Indem. Ins. Co.*, 612 F. Supp. 3d 667, 684 (W.D. Tex. 2020).

The court denies Landmark's request for summary judgment for J&R's claims under § 542.058, however. This section provides that an insurer is liable for statutory damages if, after receiving all the necessary items, statements, and forms required under § 542.055, "it delays payments of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than sixty days." *Lee*, 766 F. Supp. 2d at 826 (citing TEX. INS. CODE § 542.058(a)). This claim is intertwined with J&R's breach of contract claim. As detailed above, there is a genuine factual dispute material to determining whether more of the damage to the Worthington is covered by the policy. If J&R is correct that more policy proceeds are due, "those amounts are untimely as a matter of law, warranting penalty interest under Tex. Ins. Code § 542.060." *Tex. Friends Chabad-Lubavitch*, 539 F. Supp. 3d at 681. "[A]n insurer's acceptance and partial payment of the claim within the statutory deadline does not preclude liability for interest on amounts owed but unpaid when the statutory deadline expires." *Id.* (quoting *Hinojos v. State Farm Lloyds*, 619 S.W.3d 651, 658 (Tex. 2021)). Because the court denies Landmark's motion for summary judgment as to most of the breach of contract claim, it denies Landmark's motion for summary judgment on the § 542.058 claim as well.[13]

---

[13] Landmark argues that it complied with § 542.058 because J&R did not provide Landmark with its own reports, estimates, and so forth until after sending a pre-suit notice letter in March 2024. (Docket Entry

**IV.     Conclusion**

Landmark's motion for summary judgment, (Docket Entry No. 16), is granted in part and denied in part.  The court denies summary judgment on the breach of contract claim.  The court limits J&R's potential recovery to actual cash value for Buildings 2 through 12 and denies recovery for interior or hail damage.  The court grants summary judgment to Landmark on J&R's claims for bad faith.  The court grants summary judgment to Landmark on J&R's claims for violations of Chapter 542 except the claim under § 542.058.

The claims for breach of contract and violation of § 542.058 will proceed to trial.

SIGNED on January 12, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

---

No. 31 at 12).  But Landmark provides no caselaw to support its argument that such information is included in the "items, statements, and forms reasonably required under Section 542.055."  Landmark's argument is also notably contradictory: it both asserts that it is not liable under § 542.056 because it promptly notified J&R after receiving the last piece of information necessary to secure final proof of loss, and that it is not liable under § 542.058 because J&R failed to provide all the information necessary to properly calculate the claim.